# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs July 16, 2013

## STATE OF TENNESSEE v. JAWARAS BEAUREGARD

**Appeal from the Criminal Court for Davidson County**
**Nos. 2010-A-2, 2010-B-1588     J. Randall Wyatt, Jr., Judge**

_____

**No. M2012-02312-CCA-R3-CD - Filed November 14, 2013**

_____

The Defendant-Appellant, Jawaras Beauregard, was indicted by the Davidson County grand jury for attempted especially aggravated robbery and attempted first degree premeditated murder. He was convicted by a jury of the charged offense of attempted especially aggravated robbery and the lesser included offense of attempted voluntary manslaughter. He was sentenced as a Range I, standard offender to nine years for the attempted especially aggravated robbery conviction and as a Range II, multiple offender to a concurrent sentence of five years for the attempted voluntary manslaughter conviction. On appeal, he argues: (1) the trial court erred in denying his motion to suppress the victim's identification of him in a photographic lineup; and (2) the evidence is insufficient to sustain his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which and ROGER A. PAGE, J., joined. D. KELLY THOMAS, JR., J., not participating.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant District Public Defender (on appeal); and Kristin Stangl and Katie Weiss, Assistant District Public Defenders (at trial), for the Defendant-Appellant, Jawaras Beauregard.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; and Rachel Thomas-Spain, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## FACTS

**Suppression Hearing.** Scott Sulfridge, a retired detective with the Metropolitan Nashville Police Department, testified that on March 16, 2009, he investigated an incident involving the victim, Lamin Darboe, that occurred at 11:30 p.m. near the intersection of Thompson Lane and Nolensville Road. Upon arriving at the scene, he saw a taxi cab van that appeared to have "veered off" Nolensville Road before hitting one or more cars in a nearby Nissan dealership parking lot. Detective Sulfridge was informed by other officers that the victim, who had been driving the cab prior to the collision, had already been transported to the hospital. He was also told that the victim had jumped from his cab, which was traveling at a speed of approximately forty miles per hour, onto Nolensville Road because he was being robbed.

When Detective Sulfridge interviewed the victim at the hospital, the victim told him that two African-American males between the ages of twenty-five and thirty-five had tried to rob him. In addition, the victim stated that one of his assailants was between five feet, ten inches and six feet tall and the other man was shorter.

Approximately two hours after the incident involving the victim, Detective Sulfridge drove down Nolensville Road and turned onto Thompson Lane where he saw a man, whom he later identified as the Defendant, walking a few hundred yards from the Nissan dealership toward Briley Parkway. Detective Sulfridge stated that the Defendant was "in obvious pain" because he paused for fifteen to twenty seconds between steps. Because of the Defendant's injuries and his proximity to the incident, Detective Sulfridge suspected that the Defendant was likely involved in the recent crimes against the victim. Detective Sulfridge immediately called for a patrol car, and when the officer arrived, they approached the Defendant. Detective Sulfridge immediately observed that the Defendant had glass in his hair and on his face, which was consistent with a recent car wreck. The Defendant also had a scratch on his head and a leg injury. When Detective Sulfridge asked about his injuries, the Defendant replied that he had fallen.

After talking with the Defendant, Detective Sulfridge returned to the police station and prepared a photographic lineup that included a picture of the Defendant. He immediately took the lineup to the hospital to show it to the victim. Detective Sulfridge used a standard police department form to explain to the victim that the perpetrator of the crimes against him may or may not be included in the photographic lineup and that the photographs of the individuals in the lineup could be old or the individuals' hairstyles could have changed. He informed the victim that he should not feel pressure to choose anyone from the lineup and

that he should focus on the individuals' facial features. When Detective Sulfridge presented the photographic lineup, the victim "[v]ery quickly" identified the Defendant in the lineup in a matter of seconds. He said the victim was "[a]bsolutely positive" that the Defendant was the person who pointed the gun at him. Detective Sulfridge stated that the victim identified the Defendant in photograph number six of the lineup on March 18, 2009, just a few hours after the offenses occurred.

Detective Sulfridge testified that when he prepared photographic lineups, he typically chose photographs of individuals who were in the same age group and had the same physical attributes as the alleged perpetrator. He stated that although age was important, an individual's appearance was more important in determining whether the individual should be placed in the lineup. Detective Sulfridge stated that when he prepared the photographic lineup in this case, he looked for African-American men with similar hair and eye color to the Defendant. He acknowledged that he did not include a search term for the category for age in this case but asserted that he usually evaluated the photographs himself. He also stated that he never included height in the search terms because the photographs were not full-length pictures. Detective Sulfridge said that it would not surprise him that three of the individuals in this lineup were in their forties and one of the individuals in the lineup was eighteen. He asserted that some of the men in their forties did not look that old and that the man who was approximately eighteen looked like he was in his twenties. Detective Sulfridge acknowledged that only two men, including the Defendant, were within the age range given by the victim.

The victim testified that on the night of March 17, 2009, he was working as a taxi driver and picked up two men from the Wal-Mart parking lot at Nolensville Road and Harding Place. The victim stated that one of the men, whom he later identified as the Defendant, approached his cab to talk to him. The victim closely observed the Defendant before he got into his cab because he was "concern[ed]" about his intentions. Both of the men got into the back seat of the cab and asked to go downtown. The victim said the Defendant sat in the back passenger's side seat and the other man sat directly behind him in the back driver's side seat.

When the victim started driving in the direction of downtown, the men "pulled guns" on him and demanded his money. The victim told the men that he did not have any money because he had just come from class and had not collected any cab fares that night. The victim said the men did not believe that he did not have any money, so the victim offered to stop the cab so that they could search him, but they told him to continue driving. He stated that he was able to get a good look at both of the men in the backseat of his cab. The victim said he was "really scared" during the robbery and tried to comply with the men's requests.

As he was driving, the victim saw a police car and began following it. He blew his horn and flashed his lights in an attempt to get the officer's attention. When his assailants saw what he was doing, they tried to grab the steering wheel and began struggling with him. The victim said that he tried to keep the car on the road during this struggle. The man sitting in the back driver's side seat fired his gun, shattering a backseat window, and then the Defendant attempted to jump out of the cab through that broken window. The man sitting directly behind him continued to struggle with him to gain control of the steering wheel and then fired a second shot "that kind of hit [the victim] on [his] head." At that point, the victim jumped out of the cab.

The victim stated that he was transported to the hospital for his injuries. He later met with Detective Sulfridge, who showed him a photographic lineup while he was still at the hospital. The victim stated that Detective Sulfridge did not highlight or point to any of the photographs in the lineup. The victim identified the individual in photograph six as the Defendant, the man sitting in the back passenger's side seat "right away." He stated that both men were in his cab for five to ten minutes and that he was able to closely look at them.

**Trial.** The victim, a native of Gambia, West Africa, testified that on March 17, 2009, he was working as a taxi driver for Yellow Cab. He stated that he started working at 10:00 p.m., after his physics class, and drove straight to the Wal-Mart at Harding Place and Nolensville Road in Nashville to wait for paying customers.

After he parked in the Wal-Mart lot, a man, whom he later identified at trial as the Defendant, approached his cab and knocked on his window. The victim rolled down his window, and the Defendant asked him if he was the driver of the cab he had called. The victim said that he had not been called but could drive him wherever he wanted to go. The Defendant asked the victim to stay there while he got his friend from inside Wal-Mart. The victim stated he was in a well-lit area because he had parked his cab under one of the street lights in the parking lot. Because there was plenty of light, he was able to closely look at the Defendant when he knocked on his window and talked to him.

The Defendant returned to the victim's cab approximately five minutes later with another man. The victim opened the door to the backseat, and the men told him they wanted to go downtown. He stated that the Defendant sat in the back passenger's side seat and the other man sat directly behind him in the back driver's side seat.

The victim drove out of the parking lot and headed downtown. A couple of minutes after pulling out onto Nolensville Road, the victim felt "something on [his] side[,]" and the Defendant said something like, "Hey, man, this is a stick up." When the victim told him that he did not understand what a "stick up" was, the Defendant pointed his gun at the victim's

-4-

face and said, "You see this?" Then the Defendant said, "This is a gun. Keep driving." When the Defendant asked for his wallet, the victim responded that he had just begun working after his class and did not have any money. The victim slowed his cab, and the Defendant told him to keep driving. The victim stated that the Defendant and the other man both had guns.

The Defendant told the victim to turn down a street, but just before he got to that street, the victim saw a police car and decided to follow it. The victim began blowing his horn, speeding, and flashing his headlights at the police car with the hope of getting the officer's attention, but the officer did not appear to notice. When the victim's assailants saw what he was doing, the man in the back driver's side seat started grabbing the steering wheel in an attempt to get the car off the road. At the same time, the Defendant fired his gun at the backseat passenger window, shattering it, and then attempted to jump out of this window. The man in the back driver's side seat continued to grab at the steering wheel, which caused the vehicle to weave on the road. Because the car was unsteady, the Defendant was unable to jump out the window and fell back in the car.

Then the Defendant, with the gun in his left hand, reached between the front driver's seat and the front passenger seat. The victim grabbed the Defendant's hand, pulled the gun away from him, and aimed the gun at the other man who was trying to grab the steering wheel. The victim pulled the trigger, but the gun did not fire. Then the Defendant snatched the gun out of the victim's hand and fired a second shot, and the victim felt "a heavy blow [to his] head" as the bullet grazed him.

After the Defendant's second shot, the man sitting behind the victim continued to grab at the steering wheel, causing the car to weave. The victim fell in the direction of the front passenger seat but held onto the driver's side door handle in order to stay in his seat, which caused the driver's door to open. As the cab turned, the victim was pushed into the driver's side door. When the victim realized that the man's arms were between him and the steering wheel, he decided to jump out of the cab.

The victim said that he was terrified during the incident because he thought he was going to die. He also stated that he jumped out of the cab because he thought it was the only way to escape. After he jumped out of the cab, it collided with a car in the Nissan dealership's parking lot at the intersection of Nolensville Road and Thompson Lane. The victim rolled onto the road, and a woman in an SUV asked him if he needed help. She then drove the victim to a nearby hospital.

During the incident, the victim received a large laceration to his head from the Defendant's bullet that required five staples. He stated that his head laceration resulted in

a scar. He also had a large cut on his lip that required stitches, which resulted in a scar. In addition, he underwent surgery to fix his broken elbow, which resulted in a scar. The victim displayed these three scars to the jury during trial. The victim stated that he also sustained a severe bruise on his left hand as well as several bruises and scrapes on his body from the incident. The victim stated that he informed hospital staff and the police that he had been shot. He acknowledged that he was at the hospital for approximately two hours before he was discharged.

The victim told the police that the Defendant and the other assailant were African-American men between the ages of twenty-five and thirty-five. He also stated that the Defendant was wearing blue jeans and a black or gray sweatshirt with blue on it. The victim later viewed a photographic lineup containing six pictures and identified the individual in photograph number six as the Defendant. He stated that the Defendant was the individual who had originally approached his cab, had sat in the back passenger's side seat, had stuck the gun in his ribs, and had shot the bullet that grazed his head.

James Reese, a patrol officer with the Metropolitan Nashville Police Department, testified that on March 17, 2009, he responded to a call at the intersection of Nolensville Pike and Thompson Lane. Upon his arrival, Officer Reese saw a Yellow Cab minivan that had collided with two other vehicles in the parking lot of the Nissan dealership. He examined the cab and noticed that the entire front end of the vehicle was "smashed." In addition, the front windshield and the two front windows were damaged, the airbags had been deployed, and the rear passenger window was shattered. He noted that other than the broken rear passenger window, most of the damage to the cab was in the front of the vehicle. Officer Reese said that the victim had already been taken to the hospital by the time he arrived on the scene.

Officer Reese later went to the hospital to talk to the victim about the incident. He noticed that the victim had a "severe laceration" to the crown of his head and "road rash" from jumping out of the moving cab. The victim stated that his assailants were two African-American males between the ages of twenty-five and thirty-five. Officer Reese acknowledged that his police report did not mention that the victim had been shot, that shots had been fired in the cab, or that the men had pulled a gun on the victim; however, he asserted that he noted the victim's severe head laceration in his report.

Officer Reese stated that approximately an hour after the incident involving the victim, Detective Sulfridge was driving in the area near where the incident occurred and saw a man, later identified as the Defendant, "hobbling" down the road. Officer Reese drove to the area, which was two to three tenths of a mile from the Nissan dealership, and saw the Defendant limping from an apparent leg injury along the side of the road. He said the

Defendant was African-American, approximately six feet tall with an average build, and had a medium complexion. Officer Reese stated that he observed shattered glass in the Defendant's hair but did not mention this in his police report because he had already completed his report by the time Detective Sulfridge found the Defendant near the Nissan dealership. He stated that he did not do a supplemental police report because he allowed Detective Sulfridge to handle the case from that point forward. He remembered that the Defendant was wearing a black shirt when he saw him walking along the road, but he did not remember if the Defendant was wearing blue jeans or pants at the time.

Jacqueline Carter testified that some time after 11:00 p.m. on March 17, 2009, she saw a man jump from a cab and roll onto the road while she was at a fast-food drive-thru on Nolensville Road. She said the cab turned right at the red light before hitting a car at the Nissan dealership. After the collision, Carter saw two African-American men jump out of the cab and run around the side of the dealership. She stated that one of these men appeared to be at least five feet, eight inches tall and wore a black jacket and blue jeans. She said the other man was wearing a dark-colored shirt. Carter said she got out of her car, called 9-1-1, and walked across the street to the wrecked cab.

Charles Linville, a crime scene investigator for the Metropolitan Nashville Police Department, testified that around 5:30 a.m. on March 18, 2009, he responded to the police impound lot to process a Yellow Cab van. He observed that the front of the van was heavily damaged and looked as if it had been wrecked. Investigator Linville was unable to obtain any fingerprint evidence from the van because the inside and outside of the vehicle was wet. He photographed the van and collected a black skull cap from inside.

Detective Scott Sulfridge testified that on March 17, 2009, he responded to a call regarding a robbery at the intersection of Thompson Lane and Nolensville Road. Detective Sulfridge said he first went to the hospital to talk with the victim. He immediately observed that the victim "was in pretty bad shape" and was "in a lot of pain." He stated that the victim had received a head injury during the incident. The victim told him that his assailants were two African-American men wearing dark clothes between the ages of twenty-five and thirty-five. Detective Sulfridge did not remember whether the victim told him that shots had been fired, but he acknowledged that he did not mention that shots had been fired or that the victim had been shot in his police report. Instead, he recalled the victim telling him that he had been "pistol-whipped" with a gun during the incident.

Detective Sulfridge stated that two or three hours after the incident, he drove down Nolensville Road and turned onto Thompson Lane going east. Shortly thereafter, he noticed a African-American man, later identified as the Defendant, limping along Thompson Lane near Nolensville Road. He stated that it was obvious that the Defendant was in pain.

Detective Sulfridge stated that the Defendant was a half mile to a mile away from the Nissan dealership where the collision had occurred.

Detective Sulfridge stated that he immediately became suspicious that the Defendant's injuries were from the incident involving the victim and called a patrol unit to meet him at that location. When the other officer arrived, they approached the Defendant. Detective Sulfridge immediately noticed that the Defendant had glass fragments in his hair, cuts on his head, and an apparent injury to his leg. He asked the Defendant how he had been injured, and the Defendant replied that he had fallen but never explained why he had glass in his hair. Detective Sulfridge stated that the Defendant did not have a gun on his person at the time of his arrest and that no guns were found in connection with this case. He acknowledged that he did not mention the glass in the Defendant's hair in his police report. However, in the affidavit supporting the arrest warrant, Detective Sulfridge wrote that the Defendant had a cut around his eye, an apparent broken leg, and small particles of glass in his hair. He stated that the Defendant was transported to the hospital for his injuries and was arrested later that night.

Detective Sulfridge prepared a photographic lineup that included a photograph of the Defendant. He stated that when he prepared the lineup, he looked for individuals who "fit the same general description" given by the victim. Detective Sulfridge said he wanted the people in the lineup to be similar to one another but not identical. He generated the lineup by entering certain identifiers and then evaluated the photographs to find individuals with similar characteristics to those of the Defendant. Although he searched for individuals between the ages of twenty-five and thirty-five, he focused on the individuals' appearance rather than their age in choosing them for the lineup. He stated that he was surprised to learn that the individual in photograph one was forty-five years old but asserted that the individual could be thirty-five years old based on his appearance. He acknowledged that the individual in photograph number two was eighteen. He agreed that the individual in photograph three was forty-three years old and the individual in photograph five was forty-eight years old. Detective Sulfridge acknowledged that the individual in photograph number four was heavier than the other individuals in the lineup and that he might have removed that individual from the lineup if he were to do it over again. However, he stated that the remaining five individuals in the lineup were "similar enough." He stated that the fact that photographs one and two were father and son did not affect the lineup because they did not look like one another. Detective Sulfridge acknowledged that he did not collect the clothing that the Defendant was wearing as evidence. He also admitted that neither he nor the other officers looked for shell casings at the scene because no one knew that the victim had been shot.

Detective Sulfridge went to the hospital and presented the lineup to the victim. Using a standard form provided by the police department, Detective Sulfridge informed the victim

that his perpetrators might or might not be in the lineup. He also told the victim that the individuals' hairstyles could have changed and that he should focus on the facial features of each of the individuals in the lineup. He stressed that the victim should only choose a photograph if he recognized the individual from the incident. Detective Sulfridge said that in a matter of seconds, the victim identified photograph number six, the Defendant, as one of the men who tried to rob him. Detective Sulfridge stated that the victim was "positive" about his identification of the Defendant.

## ANALYSIS

I. **Motion to Suppress.** The Defendant argues that the trial court erred in denying his motion to suppress the victim's identification of him in the photographic lineup. He asserts that the identification procedures used by the police deprived him of his right to a fair trial and his right to due process of law. The Defendant claims that although the victim asserted that his assailants were between the ages of twenty-five and thirty-five, only two of the six men in the photographic lineup, including the Defendant, were within this age range. The State responds by arguing that the Defendant failed to establish that the pre-trial photographic lineup was unnecessarily suggestive. We agree with the State.

On November 14, 2011, the Defendant filed a motion to suppress, wherein he claimed that the photographic lineup was so unduly suggestive that it gave rise to an irreparable risk of misidentification and that the victim's identification was unreliable. Specifically, he claimed that the photographic lineup was unnecessarily suggestive because the men in the lineup were not similar in age or appearance to him.

At the conclusion of the suppression hearing, the trial court noted that while some of the individuals in the lineup appeared to be older than the Defendant and one of the individuals appeared to be younger than the Defendant, there was nothing obviously suggestive about the lineup that would lead to irreparable misidentification by the victim. The court noted that the victim was able to look at the Defendant before he got into his cab and was able to look at him while inside the cab, which increased the reliability of his identification.

In its order denying the motion to suppress, the trial court found that there was no evidence that Detective Sulfridge prompted or coached the victim to pick the Defendant out of the lineup. In evaluating whether the Defendant stood out from the other photographs, the court found that the other individuals in the lineup were "not so grossly dissimilar as to immediately project [the Defendant's] picture into the mind of the observer." The court found that Detective Sulfridge had not included an age range based on the victim's description of his assailants in lineup "but simply included individuals that appeared

generally similar to [the Defendant]." The court noted some discrepancies between the individuals in the lineup but held that these discrepancies did not cause the lineup to be unduly suggestive:

> The Court finds that suspects numbered 1, 3, and 5, do appear older than [the Defendant], who is suspect number 6. The Court finds, however, that this appearance of an age discrepancy does not rise to the level of suggestiveness or a gross dissimilarity. The Court further finds, in analyzing the other physical traits, that all of the individuals, including [the Defendant], were African-American males, with similar skin tones, fairly similar weight, similar facial hair, and all had relatively short hair. The Court, therefore, finds, after analyzing the totality of the physical traits of the individuals, that [the Defendant's] picture does not contrast significantly with [the] other individuals' picture[s] as to rise to a level of suggestiveness.

An appellate court may consider the proof presented at the suppression hearing and the trial when determining whether the trial court properly denied a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). It is well-established that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The Tennessee Supreme Court explained this standard in Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Id. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). The defendant bears the burden of showing that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 23; Yeargan, 958 S.W.2d at 629.

The Tennessee Supreme Court has held that photographic lineups are admissible unless they are unduly suggestive:

Photographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from "suggestive identification procedures." Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). Thus, a photographic identification is admissible unless, based upon the totality of the circumstances, "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301-302, 87 S. Ct. 1967, 1972, 18 L. Ed. 2d 1199, 1206 (1967).

State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998). The risk of an eyewitness making an incorrect identification is greater if the police show the eyewitness a lineup where a single photograph "is in some way emphasized." Simmons v. U.S., 390 U.S. 377, 383 (1968). In addition, the risk of misidentification increases "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Id. This court has noted that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar." State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing U.S. v. Wade, 388 U.S. 218, 233 (1967); Shye v. State, 506 S.W.2d 169, 173 (Tenn. Crim. App. 1973); Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978)).

In Neil v. Biggers, the Court established a two-part analysis that the trial court must apply in determining the validity of a pre-trial identification. 409 U.S. 188, 198-99 (1972). First, the trial court must determine whether the identification procedure was unduly suggestive. Id. at 198. Next, if the trial court determines that the identification was unduly suggestive, then it must consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Id. at 199. This court must consider the following factors in determining the reliability of an identification:

1. the opportunity of the witness to view the criminal at the time of the crime.
2. the witness's degree of attention at the time of the crime.
3. the accuracy of the witness's prior description of the criminal.
4. the level of certainty demonstrated by the witness at the confrontation.
5. the length of time between the crime and the confrontation.

Hall, 976 S.W.2d at 153 (quoting Biggers, 409 U.S. at 199); see State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). In Tennessee, it is unnecessary to apply the totality of the circumstances test in Biggers to assess the reliability of the identification if the trial court determines that the identification procedure was not unduly suggestive. See State v. Butler,

795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

After reviewing the record, we conclude that the evidence fully supports the trial court's denial of the motion to suppress based on its finding that there was nothing unduly suggestive about the photographic lineup or the identification procedure. The victim testified that the perpetrators in this case were two African-American males between twenty-five and thirty-five years of age and that one of the perpetrators was between five feet, ten inches and six feet tall and the other perpetrator was shorter. Once Detective Sulfridge developed the Defendant as a suspect in this case, he included photographs of men in the lineup that had similar physical features to those of the Defendant. Detective Sulfridge testified that in choosing individuals for the lineup, age was important, but the individual's appearance was the most important factor. The photographic lineup contained color photographs of six African-American males, with all of these men possessing fairly similar builds. In addition, all six men had some facial hair, a fairly short hairstyle, and similar skin tones. Five out of the six men, including the Defendant, were wearing a T-shirt with a round neck. Each photograph was uniform in size, and the background color of all of the photographs was nearly identical, if not identical. All of the photographs depicted the individuals from the neck up. After reviewing the photographic lineup, we conclude that only two of the men in the lineup appeared slightly older than the Defendant even though three of the men were in fact older than the Defendant. We agree that one of the men in the lineup appeared slightly younger than the Defendant. However, we agree with the State that the discrepancy in age was not "an unusual variance, especially in light of the victim's description giving a 10-year range of ages for the perpetrators." Therefore, we conclude that there was nothing about the Defendant's photograph that was "grossly dissimilar" to the photographs of the other individuals included in the photographic lineup.

We also conclude that there was nothing unnecessarily suggestive regarding the manner in which Detective Sulfridge presented the photographic lineup to the victim. Detective Sulfridge showed the photographic lineup to the victim only a few hours after the offense. He explained that the assailants may or may not be in the lineup and that he should only choose an individual in the lineup if he was certain he was one of his assailants. Detective Sulfridge cautioned the victim that the individuals' hairstyles could have changed and that the photographs included in the lineup could be old, and he encouraged the victim to focus on the facial features of each individual's photograph. The evidence at trial was undisputed that the victim identified the Defendant in the photographic lineup "very quickly" and that the victim was "positive" that the Defendant was one of his assailants. Accordingly, we conclude that the record supports the trial court's denial of the motion to suppress the victim's identification of the Defendant because the photographic lineup was not unduly suggestive. Because we have determined that the identification procedure was not unduly suggestive, we need not assess the reliability of the victim's identification.

**II. Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to support his convictions for attempted especially aggravated robbery and attempted voluntary manslaughter. Specifically, he claims that the State failed to prove his identity as one of the perpetrators of the offense and that the State failed to establish that the victim suffered serious bodily injury as required for his attempted especially aggravated robbery conviction. The State argues that there was sufficient evidence from which a rational jury could find that the Defendant and an accomplice entered the victim's cab and attempted to rob the victim and that the Defendant fired a gun at the victim before the victim jumped out of the car. We agree with the State on this issue as well.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt."

Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. Odom, 928 S.W.2d at 23. When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial

evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

The Defendant was convicted of attempted especially aggravated robbery and attempted voluntary manslaughter. Especially aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). As relevant in this case, serious bodily injury means bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Id. § 39-11-106(a)(34). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a).

The offense of criminal attempt is defined as follows:

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a).

**Identity.** The Defendant argues that the evidence is insufficient to support his convictions because the State failed to prove his identity as one of the assailants. He challenges the admissibility of the photographic lineup and of the victim's in-court identification of him and argues that the remaining proof does not establish his identity as one of the perpetrators in this case. Specifically, the Defendant asserts that although the victim testified that he had been shot during the incident, no witnesses, police reports, or medical records showed that the victim had been shot. He further asserts that no blood was found in the cab, no DNA evidence was obtained, and the gun allegedly used during the incident was never recovered. The Defendant also notes that although Detective Sulfridge testified that he saw glass fragments in his hair when he encountered him after the incident, he failed to mention this fact in his police report and failed to take any photographs of him that would support this claim.

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as a perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The

identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Strickland, 885 S.W.2d at 87 (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). In addition, as relevant here, "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)).

Just a few hours after the offense in this case occurred, the victim identified the Defendant as one of the perpetrators in the pre-trial photographic lineup. The victim made this identification within a matter of seconds and was certain that the Defendant was one of his assailants. The victim also identified the Defendant at trial. In addition, within an hour or two of the offense, the Defendant was found limping down the street less than a mile from where the incident involving the victim occurred. The Defendant had glass in his hair, which was consistent with a recent a car collision, and he matched the description that the victim had given to police. Although the Defendant told police that his injuries were from a fall, it was the jury's prerogative to reject this explanation. Moreover, the evidence also showed that the victim was able to closely look at the Defendant before he got into his cab, that the victim received a severe laceration on his head when the Defendant's bullet grazed him, that the victim informed hospital staff and the police that he had been shot, and that the rear passenger window of the cab had been shattered, which was consistent with the victim's testimony that a gun had been fired inside the cab. Officer Reese and Detective Sulfridge testified that the Defendant had shattered glass in his hair, and Detective Sulfridge noted the glass in the Defendant's hair in his affidavit for the arrest warrant. Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could have found the Defendant to be the perpetrator of the offenses in this case beyond a reasonable doubt.

**Serious Bodily Injury.** The Defendant also argues the evidence is insufficient to sustain his conviction for attempted especially aggravated robbery because the State failed to establish that the victim suffered serious bodily injury. Instead, he asserts that the evidence only supports a finding that the victim sustained "bodily injury" under Tennessee Code Annotated section 39-11-106(a)(2) and, therefore, is guilty of attempted aggravated robbery pursuant to Code sections 39-12-101(a)(3) and 39-13-402.

The Defendant, citing State v. Farmer, 380 S.W.3d 96 (Tenn. 2012), claims that the State failed to present sufficient evidence that the victim sustained serious bodily injury. He asserts that the victim's injuries did not involve a substantial risk of death, protracted loss of consciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. See T.C.A. § 39-11-106(a)(34). In Farmer, the Tennessee Supreme Court held that the State failed to present sufficient evidence showing that the victim, who was shot in the leg, suffered serious bodily injury. Farmer, 380 S.W.3d at 103. No evidence was presented

showing that the victim sustained permanent scars from being shot or that he suffered protracted impairment of his leg. Id. at 102. Interestingly, the victim in Farmer testified that he did not realize he had been shot until he noticed a hole in his pants. Id. at 101. In contrast to Farmer, the victim in this case testified that he had scars from the lacerations to his head and lip from this offense. In addition, he stated that he had a scar from the surgery required to fix his fractured elbow, which he sustained when he jumped out of the car to escape his assailants.

We agree with the State that there was sufficient evidence from which a rational jury could have found that the victim suffered serious bodily injury based on his protracted or obvious disfigurement based on his scars. Protracted, as relevant here, means "delayed or prolonged in time." State v. Derek Denton, No. 02C01-9409-CR-00186, 1996 WL 432338, at *5 (Tenn. Crim. App. Aug. 2, 1996) (citing Merriam Webster's Collegiate Dictionary 939 (10th ed.1994); American Heritage Dictionary 568 (1975)) (determining the meaning of protracted unconsciousness as a basis for serious bodily injury). The record shows that the incident causing the victim's injuries occurred on March 17, 2009. At the trial on June 18, 2012, more than three years after the incident, the victim displayed scars on his head, lip, and elbow to the jury. This court has consistently held that a scar is sufficient to support the element of serious bodily injury. See State v. James Richardson Reece, No. M2011-01556-CCA-R3-CD, 2013 WL 1089097, at *14 (Tenn. Crim. App. Mar. 14, 2013) (citing cases in which this court held that a scar constitutes protracted or obvious disfigurement for the purpose of establishing serious bodily injury), perm. app. denied (Tenn. June 17, 2013); State v. Deonte Matthews, No. M2010-00647-CCA-R3-CD, 2012 WL 5378046, at *4 (Tenn. Crim. App. Oct.31, 2012) (same); State v. Richard Dale Capps, No. M2010-02143-CCA-R3-CD, 2012 WL 3800848, at *7 (Tenn. Crim. App. Sept.4, 2012) (holding that the victim's scar from a two-inch laceration on his ear was sufficient to establish serious bodily injury), perm. app. denied (Tenn. Feb. 13, 2013); State v. Anthony D. Forster, No. M2002-0008-CCA-R3-CD, 2011 WL 1431980, at *10 (Tenn. Crim. App. April 12, 2011) (concluding that the victim's scar, which began in the middle of the bridge of her nose and ended at her lip, was sufficient to establish the element of serious bodily injury). Therefore, we conclude that there is sufficient evidence to support serious bodily injury based on the victim's protracted or obvious disfigurement.

We also agree with the State that a rational jury could have found that the victim suffered serious bodily injury based on protracted loss or substantial impairment of the function of a bodily member. The victim's medical records, which were entered into evidence at trial, show that he sustained a fractured elbow from this incident. The victim was placed in a splint and was referred to an orthopedist for additional treatment. The victim testified that he later underwent surgery to correct his broken elbow. The victim's discharge instructions noted that elbow fractures take between four and twelve weeks to heal and that

-17-

they are first treated with a splint, which is followed by a long cast. See State v. John Johnson, No. W2002-01333-CCA-R3-CD, 2003 WL 22794530, at *2 (Tenn. Crim. App. Nov. 18, 2003) (concluding that the victim suffered serious bodily injury from substantial impairment of a function of a bodily member when the victim used crutches and a cane after his injury, had a severe limp for two months after the injury, and had weakness in his leg two years after the offense). Both the victim's testimony and his medical records lead to the inference that his fractured elbow substantially impaired the use of his right arm during the weeks it was immobilized. Accordingly, we conclude that there was sufficient evidence supporting serious bodily injury based on the victim's protracted loss or substantial impairment of the function of his right arm.

Because we have already concluded that there was sufficient evidence to support the serious bodily injury element based on protracted or obvious disfigurement and protracted loss or substantial impairment of a function of a bodily member, we need not determine whether a rational jury could have found that the victim suffered serious bodily injury based on extreme physical pain, a closer question in this case. Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could have found the Defendant guilty of attempted especially aggravated robbery and attempted voluntary manslaughter beyond a reasonable doubt.

## CONCLUSION

The trial court's judgments are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE